IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

– – –

THE HONORABLE LEE H. ROSENTHAL, JUDGE PRESIDING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 4:21-CR-00250 |
| | ) | NO. 4:22-CR-00167 |
| ARYION DUPREE JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING HEARING**

OFFICIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS
Houston, Texas
**February 14, 2023**

APPEARANCES:

For the Plaintiff:   Sherri Lynn Zack, Esq.

For the Defendant:   John Dennis Hester, Esq.


Reported by:  Mary Nancy Capetillo, CSR, RPR, TRR
              Official Court Reporter
              United States District Court
              Southern District of Texas
              mary_capetillo@txs.uscourts.gov

    Proceedings reported by computerized stenotype
machine.

**PROCEEDINGS**

THE COURT:  Good afternoon.  Go ahead and state your appearances.

MS. ZACK:  Sherri Zack on behalf of the United States.  Good afternoon, Your Honor.

THE COURT:  Thank you.  Good afternoon.

MR. HESTER:  Good afternoon, Your Honor. Dennis Hester for Mr. Jackson.

THE COURT:  Mr. Jackson, please stand by your counsel.  The rest of you may be seated.

MR. HESTER:  Your Honor, may we stand up here?

THE COURT:  That's fine.  All right. Counsel, have you and Mr. Jackson together reviewed the sentencing memorandum, the PSR, and the related materials?

MR. HESTER:  Yes, Your Honor.

THE COURT:  Do you have any objections beyond those you stated in writing?

MR. HESTER:  None beyond the ones I stated in writing.

THE COURT:  All right. Let's see.  Does the government have any objections beyond the one that I think has already been taken into account?

MS. ZACK:  No, Your Honor.

THE COURT: Very good. And that, I think, helped the defendant. Good. All right. So let's take a look at the objections that have been filed. There are some difficult cross-references that requires a careful guideline application. I'd be interested to hear if anybody believes that it has been done in a way that the guidelines themselves don't support, which is a different question from whether the 3553(a) factors lead to a different result. So let's start with guideline sentence calculation objections.

MR. HESTER: Yes, Your Honor.

THE COURT: All right. As I understand it, the defendant objects to -- and we'll call them by the abbreviations used in the PSR -- MV 2's claims that the defendant threatened to kill and harm women or their families if they left him. He denies threatening Minor Victim 2 or physically assaulting her. He notes that the guideline abandoned the force allegations that were contained in part two of the indictment as part of plea agreement. Did you want to speak to that objection?

MR. HESTER: Yes, Your Honor. So this -- and I know it's difficult, but this objection is based -- or really application -- or the belief that any threats or violence were used is really based solely on the word of Minor Victim 2; and there's no

corroboration. You can look through the thousands of pages of her Instagram profile which were provided in discovery. You see no corroboration of it.

I'd also like to speak to this claim that she was, quote, unquote, branded with this five-point crown. That is not credible simply because that -- the five-point crown is a Blood symbol; and I have -- that is, according to the stophoustongangs.org, which has a lot of information on local gangs here in Houston, one of the symbols for the Blood gang is a five-point crown.

Mr. Jackson, as we know from paragraph 108 of the PSR, is a member of the Crips gangs; and we're not running from that. We're admitting that. He's a member of the Crips gang, which is a rival of the Blood gang. So the notion that he would have her branded with a rival gang's symbol is ridiculous and shows that she's not being fully truthful.

There are all sorts of things that could have happened. She could be protecting someone else and blaming Mr. Jackson for whoever gave her this brand, but we deny that he assaulted her in any way. None of the other women or girls in this case talk about him assaulting her -- them. It is true that one of the adult victims in the second case talks about being threatened and Mr. Jackson directing those threats from

Harris County jail to other people involved. However, the notion that he personally assaulted Minor Victim 2 or threatened her is wrong.

THE COURT: Let me hear from the government.

MS. ZACK: Your Honor, this victim did not pick the tattoo that she got. She had no reason to lie to law enforcement about the horrific events that befell her. He put her with other victims in a trap house. That has been corroborated by one of the victims of a count he didn't plead to under the relevant conduct. So now are they both making up the fact that they were in this trap house, that they were abused there? I don't think that's the case. There's nothing to be gained from it.

THE COURT: How old was this minor victim?

MS. ZACK: 15 at the time. And there is -- and then we look at the defendant's history. The victim was never charged with aggravated sexual assault. I mean, he's on a wanted billboard for aggravated sexual assault. He is violent. He is violent by nature. He's all over Instagram with guns, posing with guns, talking about his gang affiliation. That in and of itself is threatening to a 15-year-old girl.

She had the -- she was beaten leaving the

trap house by colleagues of his, not by him; but she even says -- and there's specificity to what she says. She was required to earn $1,000 a day, to charge 100 to $300. And based on my-not-so-great math, that means she had to engage in anywhere from three -- a little over three to ten sex acts. And if she didn't, he would find other dates for her and assault her.

And these are not facts that somebody makes up. Right. This is not some type of fantastical story that she has come up with. And the fact that nobody can come forward and say: I saw him do this -- I mean, he wasn't doing this in broad daylight, of course. I mean, he's chastising her in private. He definitely considered her property. I mean, his Instagram posts are pretty telling as far as what his respect level for women is. Is it such a stretch to think that he actually hit her? I mean, he glorified the fact that he's on the billboard for aggravated assault. He's posing on Instagram with weapons talking about how he isn't scared of anybody and talking about his gang affiliation. I mean, to say that he's some type of benevolent benefactor is ridiculous.

THE COURT: All right. I've looked through carefully this record. This is not, sadly, a unique set of circumstances. That does not in any way

lessen the severity of it.  The credible evidence, the reliable evidence, the pattern of evidence set out in the presentence report supports the descriptions in the PSR that -- Minor Victim 2 -- used force, threatened to use force in order to make sure that Minor Victim 2 obeyed his requirements for a sufficient number of commercial coerced sexual acts at the age of 15 and had to give the money to someone who acted as Mr. Jackson's lieutenant, treasurer, if you will, who collected the money from MV 2 and others for the work that she did in subjecting herself to coerced sexual encounters with strangers over and over again.

There is credible evidence in this record that shows that not only -- that even if, even if Minor Victim 2 had initially come to Mr. Jackson, it doesn't matter.  She could not consent as a matter of law.  She is incompetent by virtue of her youth to be able to consent; and even if that were not the case, even if consent is destroyed when violence, coercion, fear are used to continue to obtain the benefits of someone else's unconsented to sexual behavior.

Minor Victim 2 reported fearing for her life when Mr. Jackson pointed a gun at her head and threatened to shoot her if she did not follow his instructions to commit acts of prostitution.  There

is -- all that Mr. Jackson says is:  Didn't happen.
There is ample evidence in this record to support that
it did.  I'm going to overrule the objection to
paragraphs 15 through 18, 42, and 43.

I believe the cross-reference was properly
applied, which means that I don't believe there is a
necessity to get into the:  What if we didn't have to
apply the cross-reference set of calculations?

As a result, we are looking at -- as set
out very carefully and clearly in the PSR, we are
looking at a total offense level of 42.  I believe that
the calculations are correct, that the cross-references
are correct, and that there is no need to reduce it --
reduce the offense level downward based on sentencing
considerations -- guideline sentencing calculation
considerations.

There is an objection as well to paragraph
59 in which -- arguing that applying the
cross-references means that the four-level increase
under Section 2A3.1(b)(1) would be double-counting.  The
response from the probation officer -- and I gather from
Ms. Zack -- is that there is no double-counting.  It is
a separate kind of incremental or additional act that is
being separately punished and is specifically designed
to address the aggravated, to state it mildly, nature of

the offenses.

And here we have an upward adjustment that is applied based on reliable and credible evidence in the record that there was a dangerous weapon used or brandished in order to threaten and achieve compliance with the sexual demands put on this child.  I find no basis to sustain the objection.

Objection Number 4 to paragraphs 66 and 72, the objection, I gather, is that the base offense level should be much -- the base offense level should be much lower because the offense of conviction is for conspiracy and not for a substantive count under 1591(b)(1).

Is there anything else you want to add to that?

MR. HESTER:  Judge, I know you've read the objection, Judge.  It's based on the plain language of the statute which is very clear.  It says:  If the offense of conviction is 1591(b)(1) statute.  We also cite the *Weiland* case from the Ninth Circuit.  That agrees with our position.  I acknowledge there's a circuit split.

THE COURT:  Right.  I think the Fifth Circuit hasn't weighed in.

MR. HESTER:  Correct.  Correct.  But I

think if we're -- I think in the case of the circuits what -- we should just rely on the plain language of the guideline which says conviction and doesn't talk about a conspiracy.

THE COURT:  Ms. Zack?

MS. ZACK:  Your Honor, while I acknowledge there's a circuit split, the split weighs in favor of this Court finding that the substantive underlying count of the conviction is what the guideline is supposed to be based on.  And, further, if the Court looks to the government's charging document, we don't just charge 1594(c).  We clearly lay out what the 1594(c) is in reference to.  1594(c) is just stating that the internal conspiracy within that statute or group of statutes is recognized as such, which is why it's not charged under 371.  You know, they purposely carved out this type of conspiracy; and it would fly in the face of logic, I believe, to go with what the Ninth Circuit's interpretation is.

Additionally, as persuasive to this Court, a Northern District of Texas district court in the -- I forget the name of the case.  I think it was Bowen.  I cited it in my response -- found -- and that was a 2255; but it was based on the fact that the attorney didn't make the objection Mr. Hester is making.  And they said:

It doesn't matter because that's not correct, the correct calculation.

THE COURT:  That's the *Bonner* case.

MS. ZACK:  *Bonner*.  I wanted to say Bowen. It's *Bonner*.  In the *Bonner* case that that would -- that the correct calculation was used and that is to use the base offense level from the substantive count.

THE COURT:  I agree there's a circuit split; and the likelihood of a resolution, who knows; but I don't believe that the approach taken in the presentence report and in the guideline calculation that results is at all inconsistent with the statutory language and that following the approach taken is appropriate with the scant case law that is there to guide us.

I think that to the extent another court might go another way, I don't think it's the persuasive line.  And given the egregiousness of these facts, I'm not sure that all courts wouldn't reach the same result; but that's not the basis of my ruling.  The basis of my ruling is that I find the legal result more than sufficient -- the legal basis for the result under the guideline calculation and the facts that are set out in the PSR to amply support the guideline calculation.

There is an objection to paragraphs 83,

69, and 65 which backs out the count involving J.B. to resolve the objection. There is evidence of Mr. Jackson's involvement with Ms. Kearney and J.B. in furtherance of the conspiracy. Kearney is not a victim, and no enhancement on that ground is included. J.B. is considered an unindicted co-conspirator. No enhancement is included; but, of course, Mr. Jackson is deemed a leader or supervisor of extensive criminal activity and gets an aggravating role based on that. I don't believe any change to the role assessment is warranted.

Objection 6 is just a summary, if you agree with what I said; and I've denied the objections. Even if he would have a lower offense level, I don't believe there's a basis to do that. The same argument is presented in Objections 7 and 8.

We are looking at -- the total offense level is 42. Mr. Jackson has a criminal history category of 3. That leads to a guideline range of 360 months to life.

The Court adopts the PSR, directs that it be made a part of this record. I would be happy to hear from Mr. Hester, from Mr. Jackson, and from the government before I impose sentence.

MR. HESTER: Thank you, Your Honor. May I go first?

THE COURT:  Sure.  You can pick who goes first, you or your client.

MR. HESTER:  Thank you, Your Honor.  So the guidelines are 360 months to life.  I cited a number of cases in my memorandum that go significantly below that in much more severe cases; but I'd like to start with Mr. Jackson and the chances and opportunities he had in life growing up, because he didn't have the same chances a person like me had.

THE COURT:  I will fully agree with you that Mr. Jackson's childhood, his upbringing, the lack of support, affection, kindness, love shown him was terrible.  I can't argue with that.

MR. HESTER:  Yes, Your Honor.  And so essentially he has made bad choices in his life up until now because he didn't have good options.  He didn't have good choices to make.  His father is addicted to drugs.  His father, as he freely admits to in his letter, was womanizing and beating up women when Mr. Jackson was a child.  He was in and out of prison throughout Mr. Jackson's childhood.

His mother was also addicted to drugs and in and out of prison throughout his childhood.  And although he did -- the one route he potentially had out of this was sports and basketball, and he was a very

good basketball player.  You have letters from his sister talking about how college scouts were coming to watch him play, but at the same time his mom is addicted to crack cocaine and prostituting herself and unable to support herself and Mr. Jackson.

So what he did is turned to the streets -- as his aunt says, his aunt, Misty Hunter says -- for the love and support he was missing at home; and in doing that he became addicted to drugs at age 16.  He was using highly addictive liquid codeine on a daily basis. His judgment is extremely clouded, and he gets deeper into this life of crime by joining a gang.  All this happened when he was a child.

So -- and in doing that he finds, for lack of a better term, a community of -- a bad community; but he finds what he was missing in his childhood, the love and support he was looking for.  And that led him to this Court, and that led him to where he is today; but it started when he was too young to decide as well, when he was a child.  So that is why his history and background supports a downward variance and a significant one.

For the nature of the offense -- and I understand the Court's ruling on our PSR objections, and I'm not going to get back into it because I respect

everyone's position.  I respect your position, Judge; but the government said that in me bringing up that these two minor victims out of a -- Ms. Zack talked about the trap house.  And in the factual basis for the plea agreements, which she wrote, says there were seven to 12 women in that trap house.  So two out of those were minor victims.

I think if you look at Exhibit 3 to our sentencing memo, those girls could easily pass for adults; and I'm not victim-shaming.  I'm giving you, Judge, the reality and the full picture; and I don't know if it's effective or not, but I'm giving you the full reality and picture so you can make an informed -- fully informed decision in sentencing this man to a significant amount of time in prison.  So I think Ms. Zack is going to point those things out.  So I don't -- I'm not victim-shaming anyone.

I think if you look at the whole of this, if you look at -- and I have some of the Instagram posts.  I didn't put them in my sentencing memorandum because I'm trying to, I guess, walk a tightrope in recognizing that these two girls were underage themselves.  But there are posts on their Instagram account being very, for lack of a term, loud and proud about prostituting.  And they would have been doing this

with or without Mr. Jackson.

THE COURT:  Well, that I'm not so sure; but we don't know.  At best, we don't know.

MR. HESTER:  Yes, Judge.  We do know they were with him for a period of three months, and that's it.  There were other men in their lives who were standing -- standing by the sidelines ready to do the same thing Mr. Jackson did and people who did do things Mr. Jackson did both before and after Mr. Jackson.  So these are --

THE COURT:  And you're suggesting that mitigates Mr. Jackson's guilt?

MR. HESTER:  I'm only pointing out that it does negate --

THE COURT:  The culpability?

MR. HESTER:  -- his guilt; yeah, not his guilt at all.

THE COURT:  Or even the punishment, reduce the punishment he should receive because others were doing it after he finished or got caught?

MR. HESTER:  I think, Judge, my only point is -- and I can tell it's probably not an effective point.

THE COURT:  I'm a little troubled by it.

MR. HESTER:  Yes, I understand, Your

Honor, but that they were in this world already is my only point.

THE COURT: All right. I take it.

MR. HESTER: Mr. Jackson's youth at the time, he was 21 years old. He's been incarcerated since he was 21 years old. We know from all the science that the mind is not fully developed until 25 and that youth is a mitigating factor because as the mind ages, there's a better chance of correction especially now when he is 25. He's going to do -- get a significant prison term; and we're asking the Court for any mental health treatment, certainly drug treatment, certainly the RDAP program. He was highly addicted to drugs. He talks about being a daily user of liquid codeine and Ecstasy in the PSR.

The sentencing guidelines, Judge, are, you know -- you've calculated them. They recommend a sentence that is higher than the national average for murder, for the worst of the worst crimes. And the national average sentence for murder is 291 months. That's in my sentencing memorandum. And as bad as this is, it's not murder. I don't see how we can justify giving him more than the national average for murder.

THE COURT: What's the national average for trafficking children -- sex trafficking of children,

young women?

MR. HESTER: I couldn't find it, Judge. I could not.

THE COURT: A much more relevant comparison.

MR. HESTER: I did find many cases that I know you've read that involve the conduct. One gentleman -- I don't want to say gentleman. One man was given 15 years where the guidelines were the same as Mr. Jackson's. He ran a prostitution ring for over ten years involving children as young as 12.

THE COURT: Was that before the guidelines?

MR. HESTER: I'm sorry.

THE COURT: Was that case before the guidelines?

MR. HESTER: No, Your Honor. It was a 2017 case.

THE COURT: Interesting.

MR. HESTER: There's another case with a ten-year sentence for a defendant who sex-trafficked three minors -- two of them were 15 years old; the other was 17 -- knowing their ages. These are all comparable cases.

Another one, 151 months for a defendant

who ran a prostitution ring for over three years involving children who were 13, 15, and 17 years old. I know you've read all these, Judge. So a 210-month sentence for a defendant who prostituted two 15-year-old girls, gave them methamphetamine, drove them to sex appointments, and threatened to kick them out of the house if they didn't participate.

So in terms of avoiding unwarranted sentencing disparities -- and the Fifth Circuit says you do have to look at cases on a national, not just local scale -- I raised those cases for you to consider.

I do want to try to finish with a positive note in a case that I realize is very dark but that there is, I believe, a silver lining in this case for Mr. Jackson in that this is going to hopefully get him out of Texas because we're going to ask the Court to recommend a facility far away from Texas.

THE COURT: Far away from his gang?

MR. HESTER: Yes, up north, because he does want to get out of the gang. He's talked to me. I asked him this morning what he wants to do with his time. He said everything. He wants to do drug classes, GED, college courses -- that's -- he told Ms. Shetsky the same thing in the PSR interview -- and vocational training. And mostly he wants to get clean and learn

how to deal with his addiction issues, learn how to deal with the trauma of his childhood and, you know, the trauma that was inflicted on him by his own parents.

Fortunately -- I do point this out in our sentencing memorandum -- he has not fathered any children.  So he's not leaving any children fatherless by his conduct.  So that's another silver lining in all of this.  But, Judge, Mr. Jackson is redeemable; and the question is how much time we have to give him to make sure he never commits another offense like this to make sure he gets on the right track while also considering that he's going to be on supervised release for a significant amount of years after he gets out of prison.

And so the sentence I recommend, Judge, is 134 -- 32 months; and what that does it takes the entire decade of his 20s from him for this conduct.  That's sufficient punishment.  That's serious punishment saying:  You have lost a decade of your life.  You've lost your 20s; but now it's time to turn your life around, get straight to be on supervised release, to stay clean from drugs and alcohol and stop abusing women; and he's ready to do that.

THE COURT:  Thank you.  Let me hear from Mr. Jackson.  Then I'll hear from Ms. Zack.

THE DEFENDANT:  Your Honor, there's not

much I can say that, you know, makes up for the mistakes that I've made.  I first want to apologize to the victims and the families of the victims.  I also want to apologize to my family, also, for taking them through so much adversity.  I never really had a chance -- a fair chance at life, and it was kind of hard for me growing up and going through what I went through.  It don't make no excuse for the choices I made and mistakes I made.

Four years ago I was young-minded myself. I was dead high, dead dumb and influenced; and I can't take nothing back.  I want to consider the mistakes a lesson learned and win a second chance at life if you give me the opportunity.  I just want to make up for it. I'm sorry.

THE COURT:  Thank you, sir.  Ms. Zack?

MS. ZACK:  Your Honor, I agree with the Court that his upbringing was difficult --

THE COURT:  I'd go further than that.

MS. ZACK:  -- and that the challenges he faced could contribute to where he is today.  However, he was in multiple situations where he could have turned the corner.  He was given opportunities.  Basketball was the first opportunity, and he didn't use that to his advantage.  Then he was taken into custody on the first felony.  He was given drug treatment.  He was given

behavioral counseling, mental health help.  He didn't benefit from that.

Then he was arrested on these charges on the State side and instead of waking up and saying:  Oh, my God; this is really bad; I don't want to spend the rest of my life in prison, he decides to turn the time he is in the Harris County jail into a money-making machine.  He imports drugs on pieces of paper, liquid drugs sprayed onto paper that can then be smoked and used as currency in the jail.  He from the Harris County jail in recorded phone calls discusses with his co-defendant mother what to do with the money, how to get the money, where to put the money.

THE COURT:  The money from trafficking minors for sexual activity?

MS. ZACK:  This was money being earned at the time by Samaria Kearney, his co-defendant and --

THE COURT:  Not a victim?

MS. ZACK:  Right.  So she was a victim in the first case because she was transported in order to prostitute for his benefit.  It was not a trafficking because there was no force; but there are calls where he is sending her to Miami, sending her and J.B. to Atlanta; and this went on over and over.

And then from the Harris County jail he

then gets Samaria and J.B. to traffic S.T., an adult, and is literally on the phone with them telling them to chase her down and get that phone back before the police get it.  And they are there when the police go and rescue her, and he is on the phone with them from the jail.  There were over 12,000 jail calls from the Harris County jail.  This was -- I mean he had a whole enterprise going there.

So then he gets picked up on the federal side.  And what does he do?  He then gets ahold of contraband cell phones, gets ahold of drugs.  There are so many people that come before this Court and say:  I got arrested, and it was a wake-up call.  And while I was in custody, I got my GED; and I took this class, and I went to this thing; and I did all of that.  But right now, Judge, he stands before you conveniently ready to turn his life around.  What has he done in the interim? He has been in custody since 2019.  He's done nothing other than continue to be the criminal he is.  This is not someone who wants reform.

And Mr. Hester said:  You know, well, it was only three months.  That three months was an eternity for those girls.  Three months to a 15-year-old is a lifetime.  And this wasn't just three months going to the mall and hanging out at Starbucks.  This was

three months of not having regular food, of being given drugs, of being beaten and being raped daily three to ten times by strangers for his financial benefit.  So that in pictures on Instagrams he can wear Gucci flip-flops, flash money, have guns and look good to his gang member brothers.  That's who he is.  And now he wants to overcome that.

And let's talk about no disparities in sentencing because I can tell this Court of three cases just from this district alone, United States versus Charles Fulton, Jr., who trafficked women out of a trap house in Galveston.  He's doing life after trial.  Judge Hanks sentenced him.  David Mearis who was also a trafficker of minors and adults in front of Judge Hoyt, he is doing life in prison after trial.  Jaimian Sims, who is a TSF gang member who the defendant has affiliations with, is doing life for conspiracy to traffic a minor.

There's no disparity in his guideline range.  A sentence of at least 360 months would fall in an appropriate range given what he did for how long he did it and taking into the relevant conduct.  It's not just Minor Victim 2.  It's not just S.T.  You have K.G. who has been missing since January of 2020 who was a minor at the time.  You have Minor Victim 1 also who was

underage and even younger than Minor Victim 2.

This is not somebody, Your Honor, who wants to do anything with his life that is worthwhile or certainly has never done anything about that until he's standing in front of you. I mean, he had four years in the jail; and what did he do? He dealt drugs and used contraband phones and trafficked women. I can see how he wants reform. He's already had chances. And I get that he's young, but I don't believe that anything in this record shows that he is going to be rehabilitated to a level where he will not fall absolutely right back into what he was unless he's just so old when he gets out that they won't have him. I don't know how to protect the public from what he is capable of.

And what kind of message does it send to the fellow gang members and the other sex traffickers out on the Bissonnet track and around this country that are doing exactly what he did if you give him a sentence of 130 months and change? I mean, the kind -- he could do that standing on his head and probably make a profit. I hope you do send him out of the state of Texas, and I hope wherever he goes they keep a much better eye on him than the FDC and Harris County jail were able to do.

THE COURT: Thank you. Did you want to respond to any of what Ms. Zack has said?

MR. HESTER: Briefly. I would just note, Judge, the cases she cited were all post-trial cases where people got life. So I think those are not similarly situated defendants, and 3553(a)(6) says avoiding unwarranted disparity between similarly situated defendants. So I think someone who owns up and confess -- or pleads guilty is different than someone who has a trial, and I think the case law supports that.

As for his conduct in Harris County and Joe Corley, his opportunity -- thank goodness his opportunities at the facility he's going to go to will be much different than there. He's going to -- he will -- he's going to have access to more programs, more job training. It's just true, Judge. The BOP does --

THE COURT: I know. I know that. I'm not at all questioning the opportunities and better controls that he will have in the facilities that he is likely to go to.

MR. HESTER: Right.

THE COURT: I agree with that.

MR. HESTER: So he was sitting -- Harris County especially, there's just --

THE COURT: I'm aware.

MR. HESTER: Yes. I know you are. I know you are. So I do believe him when he says he's ready to

turn his life around, and he -- he is at the age to do it and at the age where real rehabilitation and change can happen; and you can do that with a prison -- a prison sentence plus supervised release to make sure he stays on the right track.  I do think he has things to offer the world that are positive.

THE COURT:  Anything further?

MR. HESTER:  No, Your Honor.

MS. ZACK:  Your Honor, the government is not standing here before you asking for a life sentence; but I do believe his conduct is similar to those three cases I cited you.  And had he gone to trial and had he been convicted, his guidelines would have been life; and he wouldn't have gotten acceptance, which he did, in this case.

THE COURT:  I understand.

MS. ZACK:  And that's why our sentencing number says at least 360 and does not request a life sentence.

THE COURT:  And I understood that.  There is no good way to respond from the Court to the kind of facts that I have before me.  As I said, Mr. Jackson did have a horrible childhood; but I didn't see anything in even the childhood he had that would have provided him a role model that in any world made raping a child and

subjecting her to the rape of others an acceptable line of work.  But that's what happened.  I'm desperately sorry that your mother's life was so self-defeating and self-harming and most of all that it harmed you.  I'm sorry that your father was absent.  I do note that you had supportive sisters apparently who were proud of you and wanted you to take advantage of opportunities that were available.

If everybody's childhood difficulties justified decisions to traffic in children and subject them to rape, we would be in a very sad world.  The law does not require me to reach that result.  You point out that you were young.  Yes, you were.  Your victims were 14, 15; and they may have come to you without you having to grab them off the streets and force them into it.  Who knows how desperate their own situations were and how unhappy their childhoods had been?  But you took advantage of that.  You took advantage of it; and you made them even more vulnerable by beating them, by giving them drugs, by threatening to withhold the place where you were giving them to live if they didn't do what you say -- what you said.  And what you said was: You go have sex multiple times a day with people who are strangers to you.

You were young.  They were younger.  Both

of you had terrible childhoods, but you were the one who took advantage.  You were the one who exploited.  And what was it for?  Personal financial benefit.  Standing within the gang.

Your lawyer has made very effective arguments.  He's right in the sense that you had obstacles to overcome that I cannot even imagine.  But you are not the only well-bodied pretty smart person to come out of bad homes, lousy neighborhoods, horrible parenting or absence of parenting.  You're not alone.  Not everyone goes out and traffics in children because of the deprivations of their own childhood.

I agree you did not commit murder; but the spirits of these children, their childhoods, the mark on their futures, there are different ways to die; and I'm not suggesting that you should be sentenced for anything but what you pleaded guilty to, not at all; but I'm also reluctant to understate what you did.

Have the victims been notified?

MS. ZACK:  Yes, Your Honor.

THE COURT:  Has any victim requested an opportunity to speak?

MS. ZACK:  No, Your Honor.

THE COURT:  All right.  Thank you.

I'm not rejecting your lawyer's hopes for

you.  I really -- I share them.  You are a healthy man. You're going to serve a plenty long sentence; but when you come out, you will have years, good years that can be good years.  The government is not asking for life or such a long sentence that you could not hope to survive it.  You will, and that is obviously a factor in what I'm looking at along with taking into consideration the few choices.  You did have choices, and you made them; but I certainly agree that they were much fewer than most of us are faced with.  That I -- you've convinced me of that.

Trying to put all of this together is extraordinarily difficult.  Can I see probation for just a moment, please?

(Sotto voce discussion between the court and the probation officer.)

THE COURT:  I've really struggled over what the right sentence here should be.  Statutory maximum is up to life for Count 2 -- for Count 1. Excuse me.  Guideline is 360 months to life.  I think you could certainly justify 360 months, but the factors that Mr. Jackson and his able counsel have pointed to have persuaded me that something under that is appropriate and would give a more meaningful opportunity for the turnaround that Mr. Hester has so hopefully

described to take place.

It is the Court's judgment that Mr. Jackson be sentenced to the custody of the Bureau of Prisons for a total of 324 months.  That is considerably below the 360 months, which was considerably below the life sentence that the government could have asked for. That is a total effective sentence of 324 months, all of the sentences to be served concurrently.

When you are released from the custody of the Bureau of Prisons, you will be placed on supervised release for -- I'm sorry -- for 15 years.  That's a long time; but given your network of gang activity, your persistence of running it even while incarcerated, and the horrific nature of your crimes, the Court believes that it's appropriate and necessary for the safety of the community no matter where you end up being released.

When you are released, you'll be placed on a 15-month supervised release term as to Count 2 in Case Number 250 and Count 1 in Case Number 167 to run concurrently.  You must report in person to the probation office in the district to which you are released within 72 hours of your release from the custody of the Bureau of Prisons.

While on supervised release you must not commit any federal, state, or local crime.  You must

comply with the standard conditions that have been adopted by this Court and by any mandatory conditions required by law, and you must comply with the following additional conditions:

You must comply with the requirements of the Sex Offender Registration and Notification Act as directed by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state in which you reside, work, are a student, or you were convicted of the qualifying offense.  You have to participate in a sex offense specific treatment program and follow the rules and regulations of that program.  The probation officer will supervise your participation in the program, its provider, the location, how long it lasts, how intense it is; and you must pay the cost of the program if you're financially able to do so.

Can I see the probation officer again, please?

(Sotto voce discussion between the Court and probation officer.)

THE COURT:  Some of these next conditions don't precisely fit these facts, but they do enough to warrant including them in the conditions of supervised release.

You must not have any direct conduct [sic] with any child you know or reasonably should know to be under the age of 18 without the permission of the probation officer.  If you do have any such conduct without the permission of the probation officer, you must report this conduct to the probation officer within 24 hours.  Direct conduct includes written communication, in-person communication, or physical contact.  Written communications include emails, texts, and similar -- Instagrams and whatever is going to take its place in the future.

Direct contact does not include incidental conduct during ordinary daily activities in public places.  You must not seek or maintain employment -- supervise, volunteer, or participate -- in any program or activity where minors under the age of 18 would congregate without prior written approval of the probation officer.  This includes athletic, religious, volunteer, civic or cultural activities designed for minors under the age of 18.

You must not possess or use computers or other electronic communications or data storage devices or media without the prior approval of the probation officer.  If approved, you must consent to the ongoing monitoring of such devices.  To ensure compliance with

the monitoring, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers as defined in the statute 18 U.S.C. 103(e)(1) subject to computer monitoring.  These searches will be conducted for the purpose of determining whether the computer contains any prohibited data prior to installation of the monitoring software to prohibit whether the monitoring software is functioning effectively after its installation and to determine whether there have been attempts to circumvent the monitoring software after its installation.  The Court finds that because social media and other computer-generated communications were used to further this and promote the activity that has been made in the counts of conviction that this is warranted.

You must not communicate or otherwise interact with Victims B.G. -- that is Minor Victim 1 -- J.V., Minor Victim 2; Samaria Kearney; S.T., who is Adult Victim 1; K.G.; and J.B. either directly or through someone else without first obtaining the permission of the probation officer.  You must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program.  The probation officer will supervise your participation in the program including the provider, the

location, type of program, how long it lasts, and how intense it is.  You must pay the cost of the program if financially able to do so.

You may not possess any controlled substances without a valid prescription.  If you have a valid prescription, you must follow the instructions on the prescription.  You must submit to substance abuse testing to determine if you have used a prohibited substance, and you must pay the cost of testing if financially able.  You may not attempt to obstruct or tamper with the testing methods.  You must provide the probation officer with access to any requested financial information and authorize the release of any financial information.  The probation officer may share financial information with the U.S. Attorney's Office.

You must not incur new credit charges or open additional lines of credit without the approval of the probation office.  You must not communicate or otherwise interact with any known member of the Rollin 60s Crip street gang and the GAS gang without first obtaining the permission of the probation office.  You must not be affiliated with any organized gang recognized by law enforcement agencies, and you must not participate in gang-related activities or associate with any gang members.

You must participate in an educational services program and follow the rules and regulations of that program.  That may include high school equivalency preparation and other classes designed to improve basic skills proficiency.  You must pay the cost of the program if financially able to do so, and you must participate in a vocational training program.

As of the date of this order, there are no restitution claims yet received.  Is that still accurate?

MS. ZACK:  That is correct, Your Honor.

THE COURT:  All right.  The financial information that will be shared will be there in the event restitution obligation -- claims are asserted. Under the law if there are restitution claims and the victims' losses are not -- or not -- and the victims' losses are not ascertainable by the date that has already passed ten days before sentencing, the attorney for the government and the probation officer will inform the Court; and the Court will set a date for the determination of the victims' losses not to exceed 90 days after sentencing.  So if there are claims that are made, we will be able to make sure that they are heard.

The Court does waive the JTPA assessment. The Court orders a special assessment of $100 in each of

the two cases, a total of $200, which is due immediately.  $50 is made -- must be paid now.  The balance due is paid doing payments in greater of $25 per quarter or 50 of any wages earned while in prison.  Any balance remaining after release from imprisonment will be paid in monthly installments of $100 to begin 60 days after you're released from prison through the term of supervised release.  Payments are to be made through the United States District Clerk of the Southern District of Texas.

I do recommend that you be designated to a facility far away from Texas where, as far as the bureau can determine, there are no members present who are affiliated with the gangs that you tell us you no longer want to affiliate with.

Are there any other recommendations that counsel would like to make?

MR. HESTER:  Yes, Your Honor.  For the residential drug and alcohol treatment program.

THE COURT:  I'll also recommend.

MR. HESTER:  Thank you, Your Honor.

MS. ZACK:  Your Honor, the government in case 4:21-CR-250 would move to dismiss Count 1 and Count 3.  And in Case Number 4:22-CR-167, the government would move to dismiss Count 2.  And that is only in both

of those cases as to this defendant.

THE COURT:  All right.  Will you submit a written order?

MS. ZACK:  I will.  Can I have until close of business Thursday?

THE COURT:  Yes, of course.

MS. ZACK:  Thank you, Your Honor.

THE COURT:  All right.  And I will sign those orders.  Anything further?

THE PROBATION OFFICER:  Jessica Kopp on behalf of probation.  I may have missed it, Your Honor; but did the Court rule on whether a fine would be imposed?

THE COURT:  There's no fine.  There is no ability to pay.

THE PROBATION OFFICER:  Thank you, Your Honor.

THE COURT:  Thank you.  Do either counsel or the probation officer know of any reason why this sentence cannot be imposed?

THE PROBATION OFFICER:  No, Your Honor.

MR. HESTER:  No, Your Honor.

MS. ZACK:  No, Your Honor:

THE COURT:  You do have a right to appeal, sir.  If you intend to appeal, you must file your notice

of intent to do so within 14 days from the date the

judgment is entered.  If you want to file an appeal and

you want a lawyer to represent you and cannot afford

one, you may ask the Court to appoint one.  Do you

understand those rights?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Thank you very much.  You are

all excused.

(Proceedings concluded.)

* * * * *

I, Mary Nancy Capetillo, certify that the foregoing

is a correct transcript from the record of proceedings

in the above matter.

May 29, 2023

_____

Signature of Court Reporter